## VILAS v. PRINCE.

### (Circuit Court, W. D. Wisconsin. July 6, 1898.)

### No. 549.

1. EJECTMENT—IMPROVEMENTS AND TAXES.
   A receiver's receipt for fees paid on the entry of supposed public land as a homestead is not a sufficient "written instrument" on which to claim a right to recover improvements against a successful plaintiff in ejectment, under Rev. St. Wis. § 3096.

2. SAME—GOOD FAITH OF DEFENDANT.
   Lands granted in aid of a railroad were afterwards decided by the secretary of the interior to be still open for entry. A suit in ejectment concerning one parcel was decided by the circuit court in harmony with the secretary's decision, but was appealed to the supreme court. Held, that one who entered a similar parcel as a homestead, in full knowledge of the facts, while the appeal was pending, was not a good-faith holder, and as such entitled to pay for his improvements, under Rev. St. Wis. § 3096.

This is an action of ejectment brought to recover a quarter section of land lying in the county of Ashland, Wis., to wit, the W. ½ of the N. E. ¼ and the W. ½ of the S. E. ¼ of section No. 35 in township No. 48 N. of range 4 W.

It is stipulated that the title of the land is in the plaintiff, and the only question submitted to the court is whether or not the defendant, who has been in possession under a homestead entry, is entitled to recover for the value of his improvements, under section 3096 of the Revised Statutes of Wisconsin, which is as follows: "In every case where a recovery shall be had of any land, on which the party in possession, or those under whom he claims, while holding adversely by color of title asserted in good faith, founded on descent or any written instrument, shall have made permanent and valuable improvements, or shall have paid taxes assessed, such party * * * shall be entitled to have from the plaintiff * * * if he insists upon his recovery the value of such improvements at the time the verdict or decision against him is given, and the amount paid for taxes with interest from the date of the payment. * * *" In this case the taxes have been paid by the plaintiff and his grantor,—the defendant never having paid any,—and the demand is for the value of the improvements. The land is part and parcel of the land granted by congress to the state of Wisconsin on May 5, 1864, to aid in the construction of certain railroads in the state of Wisconsin. The portion of the grant covering the land in question, according to section 3 of the act, was given to aid in the construction of a railroad from Portage City, Berlin, Doty's Island, or Fond du Lac, as the state might determine, in a northwesterly direction, to Bayfield, and thence to Superior, on Lake Superior, and conveyed every alternate section of public land designated by odd numbers for 10 sections in width on each side of said road. This portion of the grant was soon afterwards bestowed by the act of the legislature of the state upon the Portage & Lake Superior Railroad Company, the predecessor of the Wisconsin Central Company, which succeeded legitimately to all the rights of the Portage & Lake Superior Company in and to the said land grant. The railroad was completed by the Wisconsin Central Company according to the terms of the grant from the state, and the lands were conveyed by the state to said Wisconsin Central Company by patent on February 25, 1884. The land in question in this case is covered by that patent. The Wisconsin Central Railroad Company conveyed the land to John H. Knight in June, 1887, who afterwards conveyed it to the plaintiff. The lands, until entered upon by one Frank Simer as a squatter in January, 1890, were wild, uncultivated forest lands, upon which Knight, the original grantee from the railroad company, had cut timber and paid taxes. Simer sold out his claim to the defendant, who entered upon the land in August, 1890, as a part of the public domain, claiming it under the homestead law, and has been in possession

ever since. It is stipulated that the land is worth $5,000, and that the value of the defendant's improvements is $1,050. On or about January 24, 1890, the secretary of the interior of the United States decided that the lands of which this tract formed a part were excepted from the aforesaid grant by congress, and were a part of the public domain, and subject to homestead entry, and in November, 1891, ordered them to be opened for settlement under the homestead laws of the United States; and afterwards, in March, 1893, the defendant made his application to enter the land for a homestead at the United States land office at Ashland, Wis. The application was admitted by the officers of the land office, and the defendant paid the expenses of the entry, amounting to $18, and took the following receipt:

"Receiver's Receipt No. 3,274. Application No. 3,274. Homestead.

"Receiver's Office.

"Ashland, Wis., Mch. 18, 1893.

"Received of John R. Prince the sum of eighteen dollars ―――― cents; being the amount of fee and compensation of register and receiver for the entry of W. ½ N. E. ¼, and W. ½ S. E. ¼, of section 35, in township 48 N., range 4 W., under section No. 2290, Revised Statutes of the United States.

"R. C. Heydlauff, Receiver."

There were also printed in marginal notes upon the receipt the substance of the various provisions and conditions of the homestead law.

On September 15, 1890, the case of Railroad Co. v. Forsythe was heard in the United States circuit court for the Western district of Wisconsin. This case was also ejectment, and involved the title to another tract of land included in the same grant, and subject to the same conditions, as the land in the case at bar. The court, by Mr. Justice Harlan, in its opinion (see the case reported in 43 Fed. 867), took the same view as had been taken by the secretary of the interior, that the land had been reserved by the government by the act of congress of June 3, 1856, and by the action of the land department in withdrawing it from market, and did not go to the state under the grant of 1864. This case was taken by writ of error to the supreme court, and the decision of the circuit court reversed (see Id., 159 U. S. 46, 15 Sup. Ct. 1020); the court holding that the land in controversy was within the place limits of the road of the Wisconsin Central Company, and was subject to the full control of congress at the time the grant of May 5, 1864, was made, and passed to the state by operation of that grant, notwithstanding it was withdrawn by the land department in 1856 and 1859 in order to satisfy the grant made by the act of June 3, 1856. This decision confirmed the title of all these lands in the Wisconsin Central Company and its grantees. The company had in fact had the title from the day of execution of the patent from the state, in February, 1884; but the title had been thrown into contention and doubt by the action of the department of the interior, followed by the decision of the United States circuit court in the Forsythe Case. This case was pending in the supreme court upon writ of error at the time Prince went into possession and made his improvements, and it is stipulated that he had knowledge of this fact, as well as of the decision in the circuit court from which the writ of error was taken. Afterwards, in April, 1896, the secretary of the interior reversed its decision which declared said lands to be a part of the public domain, and on the 24th of October, 1896, canceled the defendant's homestead entry of the land. The entire history of these land grants, and the action of the land department concerning them, is somewhat extensive and complicated, but perhaps the above statement is enough to present the question now before the court.

William F. Vilas, for plaintiff.

Cate, Sanborn, Lamoreux & Park, for defendant.

BUNN, District Judge, after stating the facts as above, delivered the opinion of the court.

The question presented in this case is one of first impression; there being, so far as we know, no adjudicated cases on the subject.

But, upon principle, we think the defendant is neither holding under a written instrument purporting to give title, nor by color of title asserted in good faith, within the meaning of the law.

1. The receiver's receipt for the $18 paid is not a written instrument purporting to convey title, but the contrary of this clearly appears from the printed note in the margin, giving the substance, in brief, of the provisions of the homestead law. It shows that he must reside upon the land for five years in good faith for the purpose of making a homestead. He cannot sell, and his possession gives him no right to cut timber, except for the purpose of improving the land. If he should do so, he is subject to be prosecuted civilly and criminally by the government for trespass, as though he had never taken possession. The instances where homesteaders have been convicted for cutting timber from the land claimed are numerous, and the principle well adjudged. The homesteader has a right to earn the land by residing upon and improving it, and that is the extent of his right. The nominal amount of money he pays is not the compensation for the land, which still belongs to the government, but is intended to cover the expenses of surveying and platting, and fees of officers. There is not much analogy between such a case and the one where the land is purchased and paid for, and a receiver's receipt taken. Such a receipt passes the substantial interest in the land, which may be sold or mortgaged; and a judgment is a lien upon it, though technically the legal title does not pass until the patent issues. The issuing of the patent in such case is a clerical or ministerial act, which would be performed at the time of the sale, if the department were not behindhand in its routine business. The case is simply delayed to take its turn with thousands of others. It is quite otherwise with a homestead entry, which conveys no title. It is always understood that such an entry is subject to be canceled by the land department in case the land is not subject to entry, as in this case.

2. The defendant cannot be said to have held in good faith, within the meaning of the law. He knew the title to these lands was in litigation, and that the question was then pending in the supreme court of the United States, which would be the final arbiter of the question. Under the constitution, congress has full jurisdiction and power over the public lands, to regulate and dispose of them as it pleases. It had, by a deliberate act of congress, undertaken to convey these lands to the state for the purposes of aiding in certain public improvements which the government wished to have made. They had been earned by the railroad company long ago, and patents for the land issued to the company by the state. Much of them had been sold by the company, and warranty deeds given to the purchasers, who had gone into possession. They had been rendered marketable and of great value by the action of the company in building the railroad. The even-numbered sections within the place limits of 10 miles on each side of the track, which were reserved by the government, had been rendered equally valuable from the same cause. Congress did not intend to lose anything in making these grants. It was wisely and safely calculated that the sections

along the line of road reserved to the government would be doubled in value by the building of the road, so that the price could be raised from $1.25 to $2.50 per acre. They were wild forest lands, valuable principally for the pine timber on them. If the government had held for sale, and sold them for the highest price they would bear, either at public or private sale, as an individual would have done, large sums of money could have been realized to the government from these alternate sections of land-grant lands. The government, no doubt from a noble and generous sentiment of magnanimity, adopted a different course, which was to give the lands to those who would improve them for homes. It must be said that these lands were not well adapted to this purpose, and that the great and benefi-cent designs of the homestead law, so far as the pine lands in the extreme northern portions of the state are concerned, have been much abused and frustrated, and the law very generally used as a means for getting possession of the lands in order to cut the tim-ber for commercial purposes. The lands were valuable for the pine timber, but poorly adapted to farming purposes,—at least, in the present generation. It would be a noteworthy and instructive chapter in the history of the land laws if the proceedings under the law in that part of the state could be truthfully written out, so that it could be seen what the proper portion of cultivated farms made under the law would bear to the cases where the pine had been stripped from the land, and the farm left desolate. We apprehend it would then appear that the bounty of the government has been much abused. The grounds on which the secretary of the interior held that these lands were still a part of the public domain after congress had by solemn act granted them to the state were cer-tainly somewhat technical. At the time defendant made his claim the question was pending in the supreme court, and the decision of that court would determine the title. Under these circumstances, and with full knowledge of them, to squat upon the land as Simer did, or claim it under the homestead law as Prince, his assignee, did, was simply wagering on the decision of the supreme court. If that decision was against the squatter, he would lose his labor. If in his favor, he would have a valuable tract of timbered land for almost nothing, which he could sell to a lumberman or timber spec-ulator for a large price. He took his chances on the decision of another party's lawsuit, and must be content to abide the result. The remarks of Mr. Justice Brewer in delivering the opinion of the court in the Forsythe Case, with some small changes in the figures, are quite as applicable to the case at bar as they were to that case. He says:

"After years have passed, and all the parties interested in the matter, other than the United States, have treated it as the property of the plaintiff, the defendant, relying upon a technical construction of the statutes, seeks to enter the tract, and thus, for no more than the paltry sum of $400 ($2.50 per acre being the double minimum price of land within the limits of railroad grants), to obtain title to property worth, as we have seen, at least $8,000. The railroad company, under this construction, loses the land it supposed it was entitled to, which it has treated as its own, and has helped to make val-uable; the government does not receive the $8,000, nor, indeed, anything, if

the land be entered under the homestead laws; but a stranger comes in, who has done nothing to create that value, and appropriates it to his own benefit. The iniquity of such a result is at least suggestive."

The conclusion reached by the court is that the defendant is not holding the land under a written instrument, nor in good faith, within the meaning of the law which would entitle him to receive back the value of the improvements, and there will be a judgment for the plaintiff for the recovery of the land.